UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISON

KIMBERLY WROBLEWSKI,

      Plaintiff,

                                    Case No. 24-cv-10011

v.

                                    HON. MARK A. GOLDSMITH

CITY OF DETROIT et al,

      Defendants.

_____/

### OPINION & ORDER
### (1) DENYING IN PART AND GRANTING IN PART DEFENDANTS DIGUISEPPE AND GIAQUINTO'S MOTION FOR SUMMARY JUDGMENT (Dkt. 63); (2) DENYING IN PART AND GRANTING IN PART DEFENDANTS DOHERTY, RINEHART, AND WAYNE COUNTY'S MOTION FOR SUMMARY JUDGMENT (Dkt. 64); AND (3) DENYING DEFENDANT CITY OF DETROIT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 61)

Plaintiff Kimberly Wroblewski filed this lawsuit alleging various claims under 42 U.S.C. § 1983 and state law that arise from her arrest for larceny and concealing stolen property, in violation of Michigan Complied Laws 750.356(3)(a) and 750.535(3)(a), respectively. See Compl. (Dkt. 1). She alleges that the underlying investigation and prosecution for these offenses violated her constitutional rights. Id. Wroblewski brings suit against (i) Detroit Police Department (DPD) officers James DiGuiseppe and Nicholas Giaquinto; (ii) Wayne County assistant prosecuting attorney Dennis Doherty; (iii) Wayne County Sheriff's Department sergeant Brian Rinehart; (iv) the City of Detroit; and (v) Wayne County. Compl. at PageID.2–3. Before the Court are three motions for summary judgment, in which Defendants seek judgment on all of the claims.

For the reasons that follow, the Court (i) denies in part and grants in part DiGuiseppe and Giaquinto's motion for summary judgment (DPD Mot.) (Dkt. 63); (ii) denies in part and grants in

1

part Doherty, Rinehart, and Wayne County's motion for summary judgment (Wayne Mot.) (Dkt. 64); and (iii) denies the City of Detroit's motion for summary judgment (City Mot.) (Dkt. 61).

## I.   BACKGROUND[1]

Wroblewski and DiGuiseppe were married from March 2016 until May 23, 2019. Wroblewski Dep. Tr. at PageID.2749 (Dkt. 91-2); Consent Judgment of Divorce at PageID.1441 (Dkt. 63-6); DiGuiseppe Dep. Tr. at PageID.1406 (Dkt. 63-2).  During the course of their marriage, DiGuiseppe added Wroblewski to his Bank of America checking account ending in -1527 (BOA-1527 account), which was DiGuiseppe's sole account prior to the marriage.  Wroblewski Dep. Tr. at PageID.2749; BOA Personal Signature Card at PageID.2822 (Dkt. 91-7).[2]  The BOA-1527 account is at issue in this case.

Upon their divorce, the consent judgment recited the following as to DiGuiseppe:

PROPERTY TO PLAINTIFF

The Plaintiff, James DiGuiseppe, shall receive the property and/or property interests set forth below, as his sole and separate property free and clear of any claim or interest of Defendant, subject to such debt, lien, mortgage or other security interest as is presently outstanding and impressed against such property or property interest, which debt, lien, mortgage or other security interest Plaintiff shall assume and pay and hold Defendant harmless and indemnify her from any liability in connection therewith; Plaintiff shall receive and retain all insurance policies, escrow account balances or other rights incident to the property or property interests

---

[1] Because oral argument will not aid the Court's decisional process, the motions will be decided based on the parties' briefing.  See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).  In addition to the pending motions, the briefing includes: (i) as to DPD's motion: Wroblewski's response (Dkt. 83) and DPD's reply (Dkt. 97); (ii) as to Wayne County's motion: Wroblewski's response (Dkt. 91) and Wayne County's reply (Dkt. 104); (iii) as to the City of Detroit's motion: Wroblewski's response (Dkt. 66) and the City of Detroit's reply (Dkt. 79).  Wroblewski also filed an amended response to the DPD motion (Dkt. 90), which changed a heading but nothing else. Because the amended response did not attach exhibits, this opinion will refer solely to Wroblewski's original response (Dkt. 83).

[2] During the course of their marriage, DiGuiseppe had at least two other bank accounts, one at PNC and the other at a credit union, which were solely in his name.  DiGuiseppe Dep. Tr. at PageID.2139 (Dkt.83-2).

received, and/or incidents to the debts, liens, mortgage or other security interests assumed by Plaintiff:

    a.   All personal property titled in his name or in his possession, including, but not limited to, his bank accounts and retirement/pension accounts, free and clear of any claim or interest of Defendant.

Consent Judgment of Divorce at PageID.1442.

After the divorce was finalized, however, DiGuiseppe did not remove Wroblewski from the BOA-1527 account.  Wroblewski Dep. Tr. at PageID.2770; Giaquinto Dep. Tr. at PageID.2969 (Dkt. 91-12).  Because she still had access to the BOA-1527 account, Wroblewski checked the account activity regularly through her mobile banking app.  Wroblewski Dep. Tr. at PageID.2750, 2752.  When she viewed the BOA-1527 account's activity, she saw that money was being deposited into the account from DiGuiseppe's employer, the City of Detroit.  Id. at PageID.2752.

After the divorce, Wroblewski took at least two actions related to the account—one was a deposit, the other a withdrawal.[3]  Id. at PageID.2752–2753.  As to the deposit, Wroblewski testified in her deposition that she deposited half of their joint state tax refund into the account after the divorce was finalized.  Id. at PageID.2752.

The withdrawal is the act at issue in this case.  On November 4, 2019, Wroblewski went to Bank of America and withdrew $4,388.39 from the BOA-1527 account and closed the account. Id. at PageID.2753.  On the withdrawal slip, she wrote her name as "Kimberly Wroblewski." Withdrawal Slip at PageID.3012 (Dkt. 91-15).  She explained that she made the withdrawal because she was worried that if the account "went into the negative" she would be responsible for

---

[3] Wroblewski also testified that she paid for the appraisal of the home that they shared together and that she may have withdrawn the money that DiGuiseppe owed her for that payment from the BOA-1527 account.  Wroblewski Dep. Tr. at PageID.2752.  But she was unsure whether she withdrew this money before or after the divorce was finalized.  Id.

it because her name was on the account.  Wroblewski Dep. Tr. at PageID.2753.  She put the money

into a cashier's check, which she did not immediately deposit.[4]  Id.

Sometime on November 4th or 5th 2019, DiGuiseppe noticed that the money was missing

from the account.  DiGuiseppe Dep. Tr. at PageID.1407.  DiGuiseppe made this discovery when

his debit card tied to the BOA-1527 account was denied three times at two different gas stations.

Id.  After his card was declined, DiGuiseppe drove to the Bank of America branch in Lincoln Park

to inquire about his account and learned that Wroblewski had come in earlier that day, withdrew

all the money, and closed the account.  Id.  After discovering the money was missing, DiGuiseppe

did not ask Wroblewski for the money back.  Wroblewski Dep. Tr. at PageID.2753.

On November 5, 2019, DiGuiseppe filed a police report with the Westland Police

Department regarding the missing money.[5]  Westland Police Report at PageID.3010 (Dkt. 91-15);

Sleep Dep. Tr. at PageID.3026 (Dkt. 91-16).

Sometime around November 6, 2019, DiGuiseppe called Giaquinto, his commander at

DPD and friend,[6] to tell him that Wroblewski had taken the money.  Giaquinto Dep. Tr. at

PageID.2965.

---

[4] Wroblewski testified in her deposition that she "held onto" the cashier's check for a couple of
months because detective Kameron Sleep of the Westland Police Department told her that
DiGuiseppe would likely sue her for the money.  Wroblewski Dep. Tr. at PageID.2753.  After a
couple of months, Wroblewski deposited the check into her bank account.  Id.

[5] DiGuiseppe testified in his deposition that he went to the Westland Police Department to file the
initial report because he lived in Westland at the time.  DiGuiseppe Dep. Tr. at PageID.2143 (Dkt.
83).

[6] Prior to the divorce, DiGuiseppe, Giaquinto, and their families, including Wroblewski, socialized
together.  Wroblewski Dep. Tr. at PageID.2760–2761; Giaquinto Dep. Tr. at PageID.2963.  They
had been on one cruise together and they met for dinner several times.  Wroblewski Dep. Tr. at
PageID.2760–2761; Giaquinto Dep. Tr. at PageID.2963.

Giaquinto was at a conference when he answered the call from DiGuiseppe. Giaquinto Dep. Tr. at PageID.2966. Giaquinto asked DiGuiseppe some questions about the account and DiGuiseppe told Giaquinto that the account was a joint account. Id. at PageID.2965. After ending the call, Giaquinto returned to his table at the conference, where he was seated next to Defendant Doherty, who worked in the Wayne County Prosecutor's Office. Id. at PageID.2965–2966; Doherty Dep. Tr. at PageID.3163 (Dkt. 91-24). Giaquinto had met Doherty only once before the conference. Giaquinto Dep. Tr. at PageID.2963. Giaquinto told Doherty about the phone call he had just received and explained what DiGuiseppe had told him. Id. at PageID.2965–2966; Doherty Dep. Tr. at PageID.3163.[7]

Detective Kameron Sleep of the Westland Police Department was assigned to investigate DiGuiseppe's complaint. Westland Police Report at PageID.3010; Sleep Dep. Tr. at PageID.3026. Sleep met with DiGuiseppe on November 8, 2019, and DiGuiseppe provided Sleep with a receipt of the cashier's check that was made out to Wroblewski, a copy of the divorce decree, and BOA-1527 account statements from the past 12 months. Westland Police Report at PageID.3010; Sleep Dep. Tr. at PageID.3027. Sleep noticed and pointed out to DiGuiseppe that both his and Wroblewski's names were at the top of the bank statements. Westland Police Report at PageID.3010. DiGuiseppe explained that he "mainly controlled" the account but that he and Wroblewski had each other's names on their various accounts "just in case." Id. Sleep advised DiGuiseppe that since both their names were on the account, he would likely have to sue

---

[7] While unclear from the record, it does not appear that Giaquinto or Doherty took any actions related to the case at this time.

Wroblewski civilly for the money.[8]  Id.  DiGuiseppe disagreed with Sleep's assessment and was "adamant" that the divorce decree covered the issue even though Sleep wrote in his report that, "it clearly did not."  Id. at PageID.3011.

Sleep called Wroblewski to interview her a few days later.  Id.; Wroblewski Dep. Tr. at PageID.2773.  Sleep stated that Wroblewski told him that she withdrew the money and closed the account.  Westland Police Report at PageID.3011.  Wroblewski told him that the money was from a joint bank account and that she would not be giving the money back.  Wroblewski Dep. Tr. at PageID.2773.  Sleep warned Wroblewski that if she did not give the money back, DiGuiseppe would likely sue her for it.  Id.; Westland Police Report at PageID.3011.

As part of his investigation, Sleep also contacted assistant city attorney for the City of Westland Mike McNamara and asked him to review the case.  Id.; McNamara Internal Affairs Interview Transcript at PageID.2801 (Dkt. 91-5).  Sleep verbally provided McNamara with an overview of the facts of the case, and McNamara also concluded that the matter was civil because "it was a joint account with both parties' names on the account."  Westland Police Report at PageID.3011.  After hearing McNamara's assessment, Sleep called DiGuiseppe and told him that he should pursue the matter civilly.  Id.  Sleep closed his investigation.[9]  Sleep Dep. Tr. at PageID.3030.

---

[8] Later on, in his deposition, Sleep testified that he felt that the language in the divorce decree was "incredibly vague and nonspecific," and that the bank's withdrawal slip was "clearly written by somebody who had ownership of the account."  Sleep Dep. Tr. at PageID.3029.

[9] It is unclear from the record on what date Sleep closed the investigation.  Sleep's entry on the police report that states that he closed the investigation is dated November 8, 2019.  Westland Police Report at PageID.3010.  In his deposition, Sleep stated that he "doesn't recall" when exactly he told DiGuiseppe that the case "would be closed due to insufficient evidence to proceed with a criminal prosecution."  Sleep Dep. Tr. at PageID.3030.

About a month after Sleep told DiGuiseppe that he was closing the investigation, DiGuiseppe and Giaquinto visited Sleep at the Westland Police Department.  Id. at PageID.3031.  They asked Sleep to continue the investigation, even though they had no new facts.  Id.  Because there was no additional information, Sleep told them he would not continue to investigate.  Id. at PageID.3031–3032.  Sleep testified in his deposition that DiGuiseppe and Giaquinto were "upset" with him, and that they stated that they were going to continue the investigation themselves.  Id. at PageID.3032.  DiGuiseppe and Giaquinto asked for Sleep's report on the matter, and he provided it to them.  Id.

DiGuiseppe and Giaquinto continued to pursue the matter.  On March 6, 2020,[10] Giaquinto sent a draft of an "investigator's report"[11] concerning the incident to DiGuiseppe.  Giaquinto Dep. Tr. at PageID.2977.  He sent his draft to DiGuiseppe because DiGuiseppe was the "complainant," and he wanted to make sure that what he had written was correct.  Id. at PageID.2976.  Giaquinto testified in his deposition that he believed this was the first time he had written a draft of the investigator's report and sent it to anyone to review.  Id.

On July 14, 2020,[12] Giaquinto emailed Doherty a draft of the investigator's report that he had drafted.  Giaquinto Email at PageID.3179 (Dkt. 91-25).  In his email, Giaquinto asked for Doherty's "help and guidance" related to the report.  Id.  Doherty responded the same day asking for a copy of the divorce decree and "the exact language as to ownership of the bank accounts."

---

[10] There is no information in the record, what, if anything, occurred between November 2019 and March 2020.

[11] The complaint defines an "investigator's report" as a warrant request.  Compl. ¶ 47.  There are no other explanations of what an investigator's report is in the record.

[12] Again, there is no information in the record about what, if anything, occurred between March and July 2020.

Id. at PageID.3183.  On July 15, Giaquinto sent a copy of the divorce decree.  Id. at PageID.3184.

Doherty responded the same day with four follow-up questions: (i) "[w]hich branch did Wroblewski withdraw the money from?"; (ii) "[d]o we have bank records or video to prove that it was her that [sic] withdrew the money?; (iii) "[i]s it documented in a police report that Wroblewski admitted to taking the money?"; and (iv) "[t]he police obtained a confession over the phone, do we have proof that the phone number they called is Wroblewski's? (e.g., did her ex-husband give police the number)."[13]  Id.  Later that same day, Giaquinto sent Doherty a copy of the withdrawal slip and the Westland police report.  Id. at PageID.3185.

Giaquinto called Sleep at the end of 2020.[14]  Sleep Dep. Tr. at PageID.3032.  During the call, Giaquinto informed Sleep that they had enough information to "write an affidavit" for a warrant for Wroblewski; he also asked if Sleep would sign the warrant affidavit because it had been his case.  Id.  Sleep thought that Giaquinto's request was "odd" because he had not written the affidavit.  Id. at PageID.3033.  Sleep refused to sign the warrant, telling Giaquinto that, in his opinion, the facts of the case had not changed.  Id.

It is unclear from the record whether Giaquinto asked anyone else to be the affiant for the warrant.  What is clear, however, is that, months earlier, in "spring or summer of 2020," lieutenant Brian Bowser in the DPD called Wayne County Sheriff's sergeant Brian Rinehart.  Rinehart Dep. Tr. at PageID.2991–2992 (Dkt. 91-13).  Bowser and Rinehart were acquainted because they worked together as part of a multi-jurisdictional task force and sat a few feet away from each other in their office.  Id. at PageID.2991.  Bowser explained that there was an investigation that was "completed" by another DPD officer named Giaquinto.  Id. at PageID.2991.  Bowser explained

---

[13] It is unclear from the record whether Giaquinto ever responded to these questions.

[14] The record does not contain any facts explaining what, if anything, occurred between July 15, 2020 and this phone call months later.

that the prosecutors' office intended to charge the case but that they were "lacking jurisdiction" and needed Rinehart's help.  Id.  At the time, Rinehart remembered that Bowser told him that the victim in the case was a DPD officer but that he did not remember Bowser telling him that the victim was good friends with Giaquinto.  Id.  At the time, Rinehart did not know Giaquinto or DiGuiseppe.  Id.  Rinehart agreed to help.  Id. at PageID.2992.  He met with Giaquinto, who gave him the entire investigative file.  Id.

At this point, Rinehart, Giaquinto, and Doherty's memories diverge about the "investigator's report" used to establish probable cause to charge and arrest Wroblewski for larceny and concealing stolen property.  These inconsistencies involve how the report was shared amongst them, what, if any, investigative steps needed to occur before charging Wroblewski, and who drafted the investigator's report that was ultimately submitted to the court.  The Court will first outline Rinehart's viewpoint, then proceed to Giaquinto, and Doherty's.

Rinehart testified in his deposition that he received the investigator's report contained in the file he received from Giaquinto.  Rinehart Dep. Tr. at PageID.2988; 2992.  He also understood that the report was written by Giaquinto and "complete."[15]  Id.

Giaquinto, on the other hand, testified that he "kept notes" in the case file that were comprised of a summary of the discussion that took place at the conference with Doherty but that these notes were "never intended to be the investigator's report."  Giaquinto Dep. Tr. at PageID.2967.  Giaquinto assumed that Rinehart wrote the investigator's report that was sworn to.

---

[15] Again, the parties do not explain what they mean by "complete."  Rinehart goes on to explain that he did not make any changes to the investigator's report that he was given.  Rinehart Dep. Tr. at PageID.2993.  And that after he met with Giaquinto and received the entire investigative case file, the next thing Rinehart remembered is "[a]t one point I contacted [] Doherty and made arrangements to physically give the file to him so I could sign the warrant, sign the investigator's report."  Rinehart Dep. Tr. at PageID.2994.

Id.  Giaquinto also testified in his deposition that he emailed a draft of his version of the investigator's report to Doherty in July of 2020 when he first asked Doherty for help on the case and that he emailed the same copy to Bowser to give him "a summary of what was going on so he could figure out which person from his task force to assign." Id. at PageID.2969.  But Giaquinto stated that he did not give Rinehart a physical or electronic copy of the investigator's report that he drafted. Id. Giaquinto testified in his deposition that he did not tell Rinehart the investigation was completed, explaining that he told Rinehart that he thought interviewing the bank teller would be a useful next step in the investigation. Id. at PageID.2981. Giaquinto testified that after he turned over the case file to Rinehart, his only involvement in the case was with respect to calling Doherty for updates on the case on behalf of DiGuiseppe who was the "victim." Id. at PageID.2968.

After receiving the case file from Giaquinto, Rinehart reviewed parts of the file and spoke with Doherty about its contents. Rinehart Dep. Tr. at PageID.2993. Rinehart said that Doherty told him that he intended to charge the matter as a felony. Id.  Rinehart did not review all the information that Giaquinto provided him. Id. at PageID.2993–2994. Specifically, Rinehart did not remember reviewing the bank records that were provided or the Westland Police Department's report. Id. at PageID.2993. He also did not call Sleep or DiGuiseppe to interview them. Id. at PageID.2993–2994. Rinehart did read the divorce decree. Id. at PageID.2994. Rinehart explained that since Doherty had already told him that he intended to charge the matter, he was not obligated to continue to investigate further. Id. at PageID.2993. As for the investigator's report, Rinehart said that he did not make any changes to the one he received from Giaquinto because he thought it was complete. Id. at PageID.2992–2993. Rinehart then met with Doherty in September of 2020 and provided him with the investigator's report and signed the warrant request in front of him.

Rinehart Interrog. at PageID.3004 (Dkt. 91-14).  Doherty then took the investigator's report and warrant request (warrant packet) for processing.  Id.

Doherty testified in his deposition that he did not know "for sure" who drafted the investigator's report, but he "believe[d]" it was Giaquinto.  Doherty Dep. Tr. at PageID.3158.

Between January 11 and 13th, 2021, Rinehart swore to the criminal complaint before Judge Zelenak at the 25th District Court.  Rinehart Dep. Tr. at PageID.2996; Rinehart Interrogatories at PageID.3005.[16]  A version of the investigator's report was attached to the criminal complaint.  Crim. Compl. at PageID.3190 (Dkt. 91-26).  At the hearing to swear the complaint and sign the warrant, Rinehart testified that Wroblewski "intentionally withdrew money … from an [sic] [Bank of America account] that she did not have access to."  Swear to Crim. Compl./Signing of Warrant Hearing Tr. at PageID.1619–1620 (Dkt. 64-11).  Rinehart also testified that Wroblewski "was informed by the Probate Court, Divorce Court that she has [sic] no longer has any rights to assets, including retirement and/or bank accounts after the divorce was finalized" yet she "still willingly, knowingly withdrew money from [DiGuiseppe's] account."  Id. at PageID.120.  Additionally, in the investigator's report attached to the complaint, there was an allegation that DiGuiseppe added Wroblewski to the BOA-1527 account "for the sole purpose of access" and that "[a]t no time during the marriage was there a comingling of funds."  Crim. Complaint at PageID.3191.  Also included in the investigator's report used at the hearing was the allegation that, after DiGuiseppe and Wroblewski's divorce, the BOA-1527 account "reverted back to the exclusive control and

---

[16] There is no indication in the record what occurred between September 2020 when Rinehart signed the warrant packet in front of Doherty and when it was eventually sworn to on January 13, 2021.

access of Mr. DiGuiseppe." Id.  Additionally, the investigator's report stated that Wroblewski

presented herself to Bank of America as "Mrs. DiGuiseppe"[17] when she closed the account.  Id.

When the complaint was signed, an arrest warrant was also issued.  Swear to Crim.

Compl./Signing of Warrant Hearing Tr. at PageID.1620–1621.  On January 15, 2021, the Friday

before the Martin Luther King Jr. Day holiday weekend, Wroblewski was arrested on the arrest

warrant.  Wroblewski Dep. Tr. at PageID.2755.  Given the holiday weekend, Wroblewski was not

released from the Wayne County Jail until Tuesday January 19, 2021.  Id.

Wroblewski appeared in court related to the criminal charges against her about three or

four times.  Id.  Then, on April 6, 2021 at the probable cause hearing, the charges were dismissed

without prejudice.  Probable Cause Hearing Tr. at PageID.1623–1628 (Dkt. 64-12).  Reginald

Andrieux, another prosecutor at the Wayne County Prosecutor's Office appeared at the probable

cause hearing.  Id. at PageID.1625.  When the case was called, Andrieux explained that the

prosecution was unable to proceed with the case at that time.  Id. at PageID.1626.  Doherty testified

in his deposition that he gave Andrieux permission to dismiss the case without prejudice because

he was concerned that information in the investigator's report was incorrect.  Doherty Dep. Tr. at

PageID.3166.  The inaccuracy, Doherty remembered, was that Rinehart testified that Wroblewski

did not have access to the bank account, but that she did have access because her name was on the

account.  Id.

DiGuiseppe and Wroblewski eventually went back to divorce court about the $ 4,388.39.

Wroblewski Dep. Tr. at PageID.2756.  Because the paychecks deposited into the account after the

divorce were in DiGuiseppe's name alone, the divorce court judge awarded him the money back.

---

[17] It is unclear where this allegation comes from.  The withdrawal slip from the transaction states
her name as "Kimberly Wroblewski" not "Kimberly DiGuiseppe."  Withdrawal Slip at
PageID.3012.

Id.  But because DiGuiseppe owed Wroblewski money related to their divorce, Wroblewski did not have to pay DiGuiseppe the money back.  Id.  Instead, the money was credited against obligations that DiGuiseppe owed Wroblewski.  Id.

As a result of these events, Wroblewski brought this suit against the Defendants.[18]  See Compl.  All Defendants have moved for summary judgment.  For the following reasons, the Court denies in part and grants in part DPD's motion; denies in part and grants in part Wayne County's motion; and denies the City of Detroit's motion.

## II.    ANALYSIS[19]

Defendants argue that they are entitled to summary judgment for different reasons.  See DPD Mot.; Wayne Mot.; City Mot.  The Court will first examine DiGuiseppe and Giaquinto's arguments, then examine Doherty and Rinehart's arguments, and conclude with Wayne County and the City of Detroit's arguments.

### A.  DiGuiseppe and Giaquinto

Wroblewski's complaint asserts seven claims against DiGuiseppe and Giaquinto.  Four of the claims are under § 1983: illegal search and seizure, malicious prosecution, violation of

---

[18] This is not the only proceeding stemming from these same facts.  DiGuiseppe and Giaquinto sued Wroblewski, and others, in Wayne County Circuit Court for defamation and invasion of privacy, among other claims.  9/20/23 Ord. Granting Mot. for Summary Disposition at PageID.3116–3117 (Dkt. 91-19).  DPD also investigated DiGuiseppe and Giaquinto for misconduct.  Resp. to City Mot. at PageID.1649.

[19] In assessing whether a party is entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007).  A court will grant a motion for summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1985).

substantive due process, and civil conspiracy.  The remaining three claims are state-law claims:

civil conspiracy, gross negligence, and abuse of process.

### 1.  Section 1983 Claims[20]

To establish a claim under § 1983, a plaintiff must set forth (i) "the deprivation of a right

secured by the Constitution or laws of the United States" and (ii) that "the deprivation was caused

by a person acting under color of state law." Ellison v. Garbarino, 48 F.3d 192, 194 (6th Cir. 1995)

(punctuation modified).  For the reasons that follow, the Court denies summary judgment to

DiGuiseppe and Giaquinto regarding search and seizure, malicious prosecution, and civil

conspiracy but grants summary judgment to DiGuiseppe and Giaquinto regarding substantive due

process.

### a.  Illegal Search and Seizure (Count I)

DiGuiseppe and Giaquinto first argue that the Court should grant summary judgment in

their favor on Wroblewski's Fourth Amendment illegal search and seizure claim.  The Fourth

Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and

effects, against unreasonable searches and seizures." Devenpeck v. Alford, 543 U.S. 146, 152

(2004).  "[F]or § 1983 liability in Fourth Amendment cases, the seizure must be unreasonable."

Graves v. Mahoning Cnty., 821 F.3d 772, 775 (6th Cir. 2016) (punctuation modified).  The

---

[20] Though they raised qualified immunity as an affirmative defense in their answer to
Wroblewski's complaint, DiGuiseppe and Giaquinto fail to argue that they are entitled to qualified
immunity as to the claims against them in their motion for summary judgment. See DPD Mot.
Thus, they have waived the defense of qualified immunity for the summary judgment stage of this
proceeding. Brown v. Crowley, 312 F.3d 782, 787–788 (6th Cir. 2002) (finding that the court did
not need to address the defendants' qualified immunity argument at the appellate stage because
the defendants did not raise the affirmative defense of qualified immunity before the district court
at the summary judgment stage).  DiGuiseppe and Giaquinto may assert qualified immunity at
later stages of the litigation, such as at trial. English v. Dyke, 23 F.3d 1086, 1090 (6th Cir. 1994)
(A waiver of a qualified immunity argument "need not waive the defense for all purposes but
would generally only waive the defense for the stage at which the defense should have been
asserted.").

determination of whether a seizure is unreasonable "varies from case to case." Id. Generally, however, a seizure is reasonable if there is probable cause to believe that a crime is taking place. Id. at PageID.76. "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." Devenpeck, 543 U.S. at 152. In general, whether probable cause exists in a § 1983 action is a jury question. Ouza v. City of Dearborn Heights, Mich., 969 F.3d 265, 279 (6th Cir. 2020) ("In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible.") (punctuation modified).

DiGuiseppe and Giaquinto argue that it is "undisputed" that they had enough facts to establish that Wroblewski committed larceny, and, therefore, probable cause was established. DPD Mot. at PageID.1387. They argue that they had probable cause of Wroblewski's larceny whether viewed under the "realities of ownership" test or on their reliance on the investigator's report alone which, they argue, is "unrebutted" and "undisputed."[21] Id. at PageID.1386–1387. Under the "realities of ownership" test, DiGuiseppe and Giaquinto explain, the "form" of the bank account does not control. Id. at PageID.1385–1386. The Court must look to the "actual facts of the matter" to determine the ownership of joint bank account funds. Id. at PageID.1385–1386. The "actual facts" they explain, are that DiGuiseppe had his post-divorce paychecks deposited into the BOA-1527 account and that there is no evidence that DiGuiseppe ever intended for Wroblewski to "possess[]" that money. Id. at PageID.1386.

---

[21] DiGuiseppe and Giaquinto admit that the "realities of ownership" test has never been used in Michigan to prove criminal larceny, but they provide two examples of cases from Connecticut and Maryland where individuals, who were joint account holders, where convicted of larceny for taking money from a joint account. These cases are State v. Lavigne, 57 A.3d 332 (Conn. 2012) and Wagner v. State, 128 A.3d 1 (Md. 2015).

As to the facts contained in the investigator's report, DiGuiseppe and Giaquinto allege: (i) at the time of the divorce there was $4.13 in the BOA-1527 account; (ii) Wroblewski was able to view the balance in the account and she was "aware of the nominal balance at the time of the divorce;" (iii) that the divorce decree "did not give [Wroblewski] any right to funds earned by DiGuiseppe after the divorce;" (iv) that Wroblewski knew the money in the account was coming from DPD; and (iv) that she took it without DiGuiseppe's permission.  Id. at PageID.1387. Therefore, they argue, there is no question that they had probable cause, which forecloses Wroblewski's Fourth Amendment claim.  Id. at PageID.1388.

Wroblewski disputes both of DiGuiseppe and Giaquinto's arguments.  Resp. to DPD Mot. at PageID.2105–2111.  As to the realities of ownership argument she makes three arguments.  First, she contends that the joint ownership of the BOA-1527 account means that she did not commit a crime because BOA's policy on joint bank accounts states that "each co-owner… may[,] without the consent or approval of the others[,]…deposit funds and withdraw…and close the account."  Id. at PageID.2105.  Second, she argues that the divorce decree is "silent" as to the distribution of funds in the jointly held BOA-1527 account and Wroblewski made deposits into the account during their marriage.  Id.  Lastly, she argues, citing Estate of Lewis by Lewis v. Rosebrook, that there is a presumption that joint tenants have equal rights to the funds in a joint bank account.  Id. at PageID.2106; 941 N.W.2d 74, 96–97 (Mich. App. 2019).  Overcoming that presumption, she argues, is a question of fact.  Id.[22]

---

[22] Wroblewski also argues here that the "realities of ownership test" only applies in the civil, not criminal, context.  Resp. to DPD Mot. at PageID.2106.  She explains that DiGuiseppe and Giaquinto were "advised in 2019" that the matter was civil and that that opinion was "affirmed by the Michigan Attorney General's Office and the Washtenaw County Prosecutor's Office."  Id.  The "affirmation" that Wroblewski describes are the conclusions of the Washtenaw County Prosecutor's Office's internal affairs investigation of DiGuiseppe and Giaquinto regarding this matter.  Washtenaw County Prosecutor's Office Denial of Prosecution – DiGuiseppe at

Aside from her rebuttal to the "realities of ownership" test, Wroblewski claims that the elements of larceny are not met. Resp. to DPD Mot. at PageID.2107–2108. She states that the "unrebutted facts" offered by DiGuiseppe and Giaquinto are contested. She disputes that there was only $4.13 in the BOA-1527 account on the day the divorce was finalized. Id. at PageID.2107. She did not know how much was in the account on the day the divorce was finalized, and she was not monitoring the account. Id. She contends that the divorce decree was "vague" as to the funds in the BOA-1527 account, "many" held the position that she was entitled to the funds in the account, and that the dispute over the funds is a civil and not a criminal matter. Id. She made deposits into the account before and after the divorce, and "admitted withdrawing $4,388.39 from the [BOA-1527 account]," but DiGuiseppe "did not need to be present" [for her to do so]. Id. at PageID.2108.

Wroblewski's arguments are sound, leading to the conclusion that there is a triable issue of fact as to whether there was probable cause to arrest her for larceny and concealing stolen goods. Ultimately, there are two kinds of dispute issues relevant to probable cause: (i) whether certain facts have been established, as a matter of law, and (ii) whether the established facts amount to probable cause. As to the first dispute, the record is rife with disagreements over facts, including: (i) the interpretation of the divorce decree; (ii) how much money was in the BOA-1527 account; (iii) whether Wroblewski knew the balance and whether she was "monitoring" it; and (iv) whether Wroblewski deposited money into the account after the divorce. DPD Mot. at PageID.1387–1388; Resp. to DPD Mot. at PageID.2107–2108. As for the second kind of dispute, DiGuiseppe and

---

PageID.2444–2445 (Dkt. 83-20); Washtenaw County Prosecutor's Office Denial of Prosecution – Giaquinto at PageID.2447–2448 (Dkt. 83-21). Despite this conclusion, the Wayne County Prosecutor's Office declined to prosecute DiGuiseppe and Giaquinto for their actions in this matter. Id.; Washtenaw County Prosecutor's Office Denial of Prosecution – DiGuiseppe at PageID.2444–2445.

Giaquinto have not shown that the determination of probable cause is undisputed.  Ouza, 969 F.3d at 279.  Indeed, the opposite is true—as the crux of the probable cause determination is the interpretation of the divorce decree about which the parties disagree.  DPD. Mot. at PageID.1387 ("The divorce decree…did not give [Wroblewski] any right to the funds earned by DiGuiseppe after the divorce."); Resp. to DPD Mot. at PageID.2107 ("[T]he [divorce decree] was vague as to what happened to the funds in the subject joint account after the divorce…many held the opinion that [Wroblewski] was entitled to the funds after the divorce, and that the matter was a civil matter and not a criminal matter.").

Thus, there is a triable issue of fact as to whether DiGuiseppe and Giaquinto had probable cause at the time of the arrest.  The Court denies their motion for summary judgment as to illegal search and seizure (Count I).

### b.  Malicious Prosecution (Count II)

DiGuiseppe and Giaquinto argue that the Court should grant summary judgment in their favor on Wroblewski's malicious prosecution claim.  In order to succeed in a malicious prosecution claim under § 1983, a plaintiff must prove: (i) "that a criminal prosecution was initiated against a plaintiff and the defendant made, influenced, or participated in the decision to prosecute," (ii) "there was a lack of probable cause for the criminal prosecution," (iii) that she "suffered a deprivation of liberty, as understood by Fourth Amendment jurisprudence, apart from the initial seizure," and (iv) "the criminal proceeding resolved in the plaintiff's favor."  Sykes v. Anderson, 625 F.3d 294, 308 (6th Cir. 2010) (punctuation modified).

The parties do not contest that elements one, three, and four are met.  They only address the second element—probable cause.  DPD Mot. at PageID.1390–1391; Resp. to DPD Mot. at PageID.2114–2115.  As discussed, there is a disputed issue as to probable cause.  Thus, the Court

denies DiGuiseppe and Giaquinto's motion for summary judgment as to malicious prosecution (Count II).

### c. Substantive Due Process (Count III)

The substantive due process component of the Fourteenth Amendment bars "certain government actions regardless of the fairness of the procedures used to implement them." Daniels v. Williams, 474 U.S. 327, 331 (1986). Substantive due process claims "often fall into one of two categories:" (i) "claims that an individual has been deprived of a particular constitutional guarantee," and (ii) "claims that the government has acted in a way that shock[s] the conscience." Handy-Clay v. City of Memphis, Tenn., 695 F.3d 531, 547 (6th Cir. 2012) (punctuation modified).

DiGuiseppe and Giaquinto argue that Wroblewski's allegations do not rise to a conscience-shocking level and that her "false arrest/seizure/detainment" claims must be brought under the Fourth Amendment, not under Fourteenth Amendment substantive due process. Mot. at PageID.1392–1393.

Wroblewski makes two arguments regarding her deprivation of a constitutional guarantee and one argument that DiGuiseppe and Giaquinto's actions were conscience-shocking.

Regarding deprivation of a constitutional guarantee, she argues that there is a liberty interest at stake is her "reputation, good name, honor, and integrity." Resp. to DPD at PageID.2115. However, this argument fails because the Sixth Circuit has only recognized relief for reputational damage in the context of a procedural due process claim, not a substantive due process claim.[23] It has further rejected the notion that, just because the interest is recognized in

---

[23] Moreover, the Court has "consistently recognized that 'reputation alone is not a constitutionally protected liberty or property interest.'" Smith v. City of Toledo, Ohio, 13 F.4th 508, 521 (6th Cir. 2021) (citing Cutshall v. Sundquist, 193 F.3d 466, 479 (6th Cir. 1999). "Only where the stigma of damage to a reputation is coupled with another interest, such as employment, is procedural due process protection triggered." Cutshall, 193 F.3d at 479. Wroblewski fails to couple her argument on this claim with another interest.

the procedural due process context, it is "either fundamental or inherent in the concept of ordered liberty." Lambert v. Hartman, 517 F.3d 433, 444 (6th Cir. 2008) (punctuation modified). Wroblewski's citation to Chilingirian v. Boris in support of her argument that she was deprived of a constitutional guarantee, is misplaced. 882 F.2d 200, 205 (6th Cir. 1989). Chilingirian involves a procedural due process claim, not a substantive due process claim. Id.

Her second argument that she was deprived of a right guaranteed by the constitution appears to be that DiGuiseppe and Giaquinto "falsified" and "misrepresented" evidence to have her falsely arrested. Resp. to DPD Mot. at PageID.2116. Wroblewski explains that DiGuiseppe and Giaquinto "suppressed exculpatory evidence, jumped jurisdiction, falsified evidence, and misrepresented facts to suit their own vengeful agendas … to get back at [Wroblewski]" during Wroblewski and DiGuiseppe's "contentious divorce." Resp. to DPD Mot. at PageID.2116.

Wroblewski cites two out-of-circuit cases to support her argument: Avery v. City of Milwaukee, 847 F.3d 433 (7th Cir. 2017) and Winslow v. Smith, 696 F.3d 716 (8th Cir. 2012). Id. at PageID.2117. Neither of these cases is on point factually because they found substantive due process violations for using false evidence to convict an individual, not to arrest him. In Avery, the plaintiff brought a substantive due process claim that the police's use of false evidence violated his right to a fair trial. Avery, 847 F.3d at 439 (emphasis added). Similarly, in Winslow, plaintiffs brought a substantive due process claim for reckless investigation when the police used false evidence during the plaintiffs' guilty plea hearing. Winslow, 696 F.3d at 735–736. The Seventh and Eighth Circuits found that the plaintiffs had alleged valid substantive due process claims. Id.; Avery, 847 F.3d at 439–440.

Wroblewski was not convicted of the crimes with which she was charged. Her liberty was deprived when she was arrested, but this liberty interest is not a right recognized under substantive

due process.  See e.g., Albright v. Oliver, 510 U.S. 266, 268 (1994) (plurality opinion) ("Petitioner asks us to recognize a substantive right under the Due Process Clause of the Fourteenth Amendment to be free from criminal prosecution except upon probable cause.  We decline to do so."); see also, Gregory v. City of Louisville, 444 F.3d 725, 748 (6th Cir. 2006) ("This Court has interpreted Albright as requiring that traditional claims for malicious prosecution be pursued and treated as Fourth Amendment violations when the gravamen of the complaint is continued detention without probable cause.") (punctuation modified).  Therefore, she has not shown that she was deprived of a constitutional guarantee under the substantive due process clause.

Wroblewski also argues that DiGuiseppe and Giaquinto's actions were conscience-shocking.  Resp. to DPD Mot. at PageID.2117.  The right to be free from conscience-shocking actions includes the right to be free from the "arbitrary and capricious" exercise of governmental power.  Range v. Douglas, 763 F.3d 573, 588 (6th Cir. 2014). In Range, the Sixth Circuit "recognize[d] the difficulty of determining where conscience-shocking behavior resides on the continuum of actions," which it described as follows:

> Merely negligent tortious conduct is categorically beneath constitutional due process, but conduct on the other extreme end of the culpability spectrum, that which is intended to injure without any justifiable government interest, most clearly rises to the "conscience-shocking" level. Conduct that is more akin to recklessness or gross recklessness, such as deliberate indifference, is a "matter for closer calls." These middle states of culpability "may or may not be shocking depending on the context."

Id. at 590 (punctuation modified).

As for conscience-shocking conduct, Wroblewski argues that DiGuiseppe and Giaquinto "manipulated the system" for their own purposes by (i) transferring the investigation from Lincoln Park to Detroit without permission from their supervisors; (ii) "attempt[ing] to intimidate police officers in other departments who refused to agree that a crime had been committed;" (iii)

enlist[ing] other police officers to engage in unlawful conduct; and (iv) ignoring exculpatory evidence to pursue charges against her.  Resp. to DPD Mot. at PageID.2117.

Case law makes it clear that the conduct must be truly egregious to be conscience shocking.  Range, 763 F.3d at 590 ("[T]he shocks the conscience standard is not a font of tort law, but is instead a way to conceptualize the sort of egregious behavior that rises to the level of a substantive due process violation.").  Wroblewski has not provided the Court with any case law showing how the conduct she alleges satisfies this standard and would constitute a jury-submissible claim.  She also fails to acknowledge the facts that hinder her case.  She withdrew money from the account, despite unclear language in the divorce decree, and she did not tell DiGuiseppe that she took it.  She put the money in a cashier's check and held onto it for some time before depositing it.  While she has arguments to justify her actions, she does not demonstrate that DiGuiseppe and Giaquinto had no possible basis for challenging her conduct.

Without a violation of a constitutional guaranty or any analogous conduct that any court has found to be conscience-shocking, Wroblewski has no substantive due process claim to present at trial.  Therefore, the Court grants summary judgment to DiGuiseppe and Giaquinto on her substantive due process claim (Count III).

### d.  Federal Civil Conspiracy (Count IV)

DiGuiseppe and Giaquinto argue that summary judgment should be granted in their favor on Wroblewski's federal civil conspiracy claim in Count IV.  DPD Mot. at PageID.1393–1394.  To set forth a federal claim for conspiracy to interfere with civil rights, a plaintiff must show "that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused the injury."  Robertson v. Lucas, 753 F.3d 606, 622 (6th Cir. 2014) (punctuation modified).  "To establish a conspiracy under a Section 1983 claim, a plaintiff must

first demonstrate a constitutional deprivation." Bauss v. Plymouth Twp., 233 F. App'x 490, 496 (6th Cir. 2007) (punctuation modified).

Citing Rapp v. Dutcher, 557 F. App'x 444, 450 (6th Cir. 2014), DiGuiseppe and Giaquinto argue that Wroblewski's claim of civil conspiracy under § 1983 against them should be dismissed because Wroblewski failed to demonstrate a constitutional deprivation.   DPD Mot. at PageID.1393.

The Court disagrees.   Wroblewski's alleged constitutional deprivation is her Fourth Amendment claim that the defendants lacked probable cause to arrest her.   And as demonstrated above, the Court found that there is a triable issue of fact on this issue.   To the extent, DiGuiseppe and Giaquinto argue that a constitutional injury must have been the object of the conspiracy and actually suffered by Wroblewski, see DPD Mot. at PageID.1393, she has alleged just that.   She claims she was falsely arrested and spent several days in custody.   Therefore, the Court denies summary judgment as to Wroblewski's federal civil conspiracy claim under § 1983 against DiGuiseppe and Giaquinto (Count IV).

In sum, as to DiGuiseppe and Giaquinto, the Court denies summary judgment as to Counts I, II, and IV but grants it as to Count III.

### 2.   State-Law Claims

Wroblewski brings three state law claims against DiGuiseppe and Giaquinto.   For the reasons that follow, the Court denies summary judgment to DiGuiseppe and Giaquinto on their civil conspiracy and gross negligence claims and grants summary judgment on their abuse of process claim.

### a.   State Civil Conspiracy (Count VI)

Under Michigan law, "a civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose

by criminal or unlawful means." <u>Mercurio v. Huntington Nat'l Bank</u>, 16 N.W.3d 748, 765 (Mich. App. 2023) (punctuation modified) (emphasis omitted).  A plaintiff bringing a civil conspiracy claim under Michigan state law must also prove a separate, actionable tort.  <u>Id.</u> 764.  DiGuiseppe and Giaquinto argue that Wroblewski's state civil conspiracy claim against them should be dismissed because she has not proved a separate cause of action.  DPD Mot. at PageID.1394.

Wroblewski argues that she has a viable claim for civil conspiracy because she has presented evidence that DiGuiseppe and Giaquinto were friends outside of work and had an agreement to "maliciously pin a crime on [her]."  Resp. to DPD Mot. at PageID.2118.  She also contends that DiGuiseppe and Giaquinto brought the case outside of Detroit's jurisdiction so that it could be prosecuted by Doherty and Rinehart and that they went to "great lengths" to prosecute her even after being told that no crime had been committed.  <u>Id.</u> at PageID.2118–2119.

The Court agrees with Wroblewski.  To have a viable civil conspiracy claim in Michigan, she must plead that the object of the conspiracy was an "actionable tort," which means that it is a "civil wrong for which a remedy may be obtained."  <u>Detroit Will Breathe v. City of Detroit</u>, 524 F. Supp. 3d 704, 710 (E.D. Mich. 2021) (citing <u>Tort</u>, Black's Law Dictionary (11th ed. 2019)).  She has plead a conspiracy to falsely arrest, which is actionable as a civil wrong under Section 1983 as well as under Michigan state law.  Therefore, summary judgment to DiGuiseppe and Giaquinto is denied on the civil conspiracy count (Count VI).

### 3.  Gross Negligence (Count VII)

Under Michigan law, gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."  Mich. Comp. Laws § 691.1407(8)(a).

DiGuiseppe and Giaquinto argue that Wroblewski has no viable claims for gross negligence because, under Michigan law, when a seizure is made upon probable cause, the action

cannot be grossly negligent as a matter of law.  DPD Mot. at PageID.1394–1395 (citing Hojeije v. Dep't of Treasury, 688 N.W.2d 512, 521 (Mich. App. 2004)).

This conclusory argument ignores the fact that whether probable cause in fact existed is a materially disputed issue in this case.  The Court has determined that there is a triable issue of fact as to probable cause.  DiGuiseppe and Giaquinto do not make further arguments for dismissal on any other element of this claim.  Their motion for summary judgment on this claim is denied.

### 4.  Abuse of Process (Count VIII)

Under Michigan law, an abuse of process claim requires a plaintiff to establish: (i) an ulterior purpose and (ii) an act that is improper in the regular prosecution of a case.  Friedman v. Dozorc, 312 N.W.2d 585, 595 (Mich. 1981).  An "action for abuse of process lies for the improper use of process after it has been issued, not for maliciously causing it to issue."  Id. (punctuation modified); see also Garcia v. Thorne, 520 F. App'x 304, 311 (6th Cir. 2013) (interpreting Michigan law and finding that a claim for abuse of process fails because the claim "has to do with the initiation of criminal proceedings, not the misuse of process.").  "In other words, the plaintiff must show that the defendant used a proper legal procedure for a purpose collateral to its intended use, and there must be some corroborating act that demonstrates the ulterior purpose."  Alman v. Reed, 703 F.3d 887, 905 (6th Cir. 2013) (punctuation modified).  Alman further explained:

> The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort.

Id.

DiGuiseppe and Giaquinto argue that Wroblewski does not have a viable abuse of process claim.  DPD Mot. at PageID.1396–1398.  They assert that a valid abuse of process claim must

25

show that they abused the process after the process started, not by initiating the process.  Id. at PageID.1396.  They additionally argue that the claim should be dismissed because the proper recourse for improper initiation of a suit is a claim for malicious prosecution, not an abuse of process claim.  Id. at PageID.1397.  The only action they took after the warrant was issued, they argue, was to ask a friend, Christopher Goolsby at the Brownstown Police Department, to arrest Wroblewski.  Id. at PageID.1398.  This is insufficient to establish an abuse of process claim, they argue, because DiGuiseppe was not misusing process—he was executing the warrant—which is exactly how the process is supposed to work.  Id. at PageID.1398.

Wroblewski argues that DiGuiseppe filed a false police report in Westland and that the record shows that DiGuiseppe and Giaquinto had "no lawful purpose for initiating criminal proceedings" against her except to "harass and get even" with her "engag[ing] in a witch hunt." Resp. to DPD Mot. at PageID.2121.  Wroblewski asserts that DiGuiseppe and Giaquinto "knew almost immediately" that the incident was a civil matter and not a criminal matter because the Westland Police Department would not charge her.  Id.  And the fact she demonstrated through text messages[24]—that DiGuiseppe was happy the day the arrest warrant was signed—demonstrates that DiGuiseppe and Giaquinto abused process.  Id. at PageID.2122.  Lastly, Wroblewski argues that the DPD's misconduct investigation's administrative findings against DiGuiseppe and Giaquinto demonstrate that they abused process.  Id. at PageID.2122–2123.

Wroblewski's abuse of process claim fails for two reasons.  First, Wroblewski's allegations involve the initiation of criminal proceedings, not the misuse of process.  Garcia, 520 F. App'x at 311.  Second, she alleges that DiGuiseppe and Giaquinto had an ulterior motive to "harass" and

---

[24] It is not clear who sent or received the messages.  They are presented to show that DiGuiseppe was pleased that she had been arrested.  But these messages do not show that DiGuiseppe abused process after it was initiated.

"get even" with her.  But in an abuse of process claim, "the ulterior purpose alleged must be more than harassment, defamation, exposure to excessive litigation costs, or even coercion to discontinue business."  Dalley v. Dykema Gossett, 788 N.W.2d 679, 695 (Mich. App. 2010) (punctuation modified).  Therefore, the Court grants summary judgment to DiGuiseppe and Giaquinto on abuse of process (Count VIII).

In sum, the Court denies DiGuiseppe and Giaquinto's motion for summary judgment as to Counts I, II, IV, VI, and VII.  It grants their motion for summary judgment as to Counts III and VIII.

**B. Wroblewski's Claims Against Doherty and Rinehart**

Wroblewski raises the same § 1983 and state-law claims that she does against DiGuiseppe and Giaquinto against Doherty and Rinehart.  See Compl.  Doherty and Rinehart argue that they are entitled to immunity.  Because they assert two different types of immunity, the Court will first examine Doherty's immunity arguments before addressing Rinehart's.  After addressing Doherty and Rinehart's immunity arguments, the Court will examine their arguments related to the state-law claims against them.

**1. Immunity from Liability in § 1983 Suits**

Section 1983 creates civil liability for public officials who violate a person's constitutional rights while acting under color of law.  42 U.S.C. § 1983.  The Supreme Court has recognized two types of immunities that may shield public officials from liability under § 1983.  Gregory v. City of Louisville, 444 F.3d 725, 738 (6th Cir. 2006).  The first type of immunity is qualified immunity which protects officials from liability when a reasonable official under the same circumstances would not have understood that their actions would violate a person's constitutional rights.  See Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  The second form of immunity is absolute immunity.  Gregory, 444 F.3d at 738.  Under absolute immunity, an official is protected from

liability when performing functions that are "integral to the functioning of our adversarial judicial system." Id. (punctuation modified).

Doherty asserts that he is entitled to absolute immunity for his actions related to this case. Wayne Mot. at PageID.1481–1483. In the alternative, he argues that he is entitled to qualified immunity. Id. at PageID.1483–1488. Rinehart argues that he is entitled to qualified immunity for his actions. Id.

### a. Absolute Immunity

Prosecutors are entitled to absolute immunity from suit under § 1983 when their conduct is intimately associated with the judicial phase of the criminal process. See Imbler v. Pachtman, 424 U.S. 409, 430 (1976); Higgason v. Stephens, 288 F.3d 868, 878 (6th Cir. 2002); see also Van de Kamp v. Goldstein, 555 U.S. 335, 342–343 (2009). "The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1995) (punctuation modified).

The crux of whether a prosecutor's actions are associated with the judicial process is whether the prosecutor is acting as an advocate. Smith v. Wayne, Cty of, 147 F.4th 613, 619 (6th Cir. 2025). A prosecutor's role as an advocate does not start in the courtroom. Id. To be an advocate in the courtroom, prosecutors must take steps outside of the courtroom to prepare including "the professional evaluation of the evidence assembled by the police…." Id.; see also Imbler, 424 U.S. at 431 n.33 ("Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.").

Doherty argues that he is entitled to absolute immunity for his actions in this case. Wayne Mot. at PageID.1481–1483. He argues that his activities related to Wroblewski's case involved: (i) reviewing evidence presented to him by Giaquinto and/or Rinehart, (ii) asking for additional documentation to determine whether an offense had been committed, and (iii) preparing the

warrant package.  Id. at 1482–1483.  These acts, he argues, are all actions "intimately associated with the judicial phase of the criminal process."  Id. at 1483.

Wroblewski argues that Doherty is not entitled to absolute immunity because: (i) "he was not presenting the [s]tate's case during the actions in question;" (ii) his "actions occurred before any probable cause hearing, before any arrest warrant was signed, and before any court proceeding occurred…;" (iii) he "gave legal advice to [] Giaquinto and to DiGuiseppe (since he acted in concert with Giaquinto);" and (iv) "he performed investigative functions" when he emailed Giaquinto asking for "various pieces of information/documents."  Resp. to Wayne Mot. at PageID.2726–2728.

The Court agrees with Doherty and finds that Doherty is entitled to absolute immunity for his actions in this case.  Each of Doherty's actions—reviewing evidence, asking for additional information, and making a charging decision—have all been found to be squarely within the prosecutor's role as an advocate.  Smith, 147 F.4th at 619–620.  Therefore, he is entitled to absolute immunity from the § 1983 claims against him.  The Court grants Doherty summary judgment for the § 1983 claims against him in this case, Counts I, II, III, and IV.

### b.  Qualified Immunity

As mentioned above, qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow, 457 U.S. at 818.  Created to protect government officials from interference with their official duties, qualified immunity "is an immunity from suit rather than a mere defense to liability…."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  It allows police officers "breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or

those who knowingly violate the law." Stanton v. Sims, 571 U.S. 3, 6 (2013) (punctuation modified).

In the context of an alleged Fourth Amendment violation that an officer lied on a search warrant, to overcome an officer's entitlement to qualified immunity, a § 1983 plaintiff must make "a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth." Vakilian v. Shaw, 335 F.3d 509, 517 (6th Cir. 2003). In addition, the plaintiff must then show "that the allegedly false or omitted information was material to the finding of probable cause." Id. This showing requires the plaintiff to demonstrate "substantial evidence to show a more culpable mental state." Butler v. City of Detroit, Mich., 936 F.3d 410, 418 (6th Cir. 2019) (punctuation modified).

Rinehart asserts that he is entitled to qualified immunity because the judge in a parallel proceeding in Wayne County Circuit Court found that the money in the BOA-1527 account belonged to DiGuiseppe. Wayne Mot. at PageID.1485–1486. Therefore, Rinehart asserts, there was probable cause to arrest Wroblewski so [her] "constitutional violations must fail." Id. at PageID.1488.

Wroblewski argues that she has a valid claim for false arrest because she can show that Rinehart did not have probable cause to apply for the warrant. Resp. to Wayne Mot. at PageID.2730–2731. She shows this by stating that Rinehart signed the warrant packet, "thereby affirming that is was accurate, truthful, and contained exculpatory and inculpatory evidence" and that Rinehart stated that the investigation was already completed. Id. at PageID.2731–2732. Wroblewski alleges that the following facts included in the investigator's report that was part of the complaint were untruthful: (i) she and DiGuiseppe were listed as "strangers;" (ii) that Wroblewski was "only added to the account for the sole purpose of access;" (iii) that the report

stated there was never a co-mingling of funds throughout their marriage; (iv) that the report stated that the BOA-1527 account "reverted back to the exclusive control and access of" DiGuiseppe; and (v) that she had presented herself as "Mrs. DiGuiseppe" at the Bank of America when closing the account.  Id. at PageID.2732–2733.

Critically, none of Wroblewski's claims as to Rinehart allege anything about Rinehart's mental state, which is a necessary requirement to overcome an officer's entitlement to qualified immunity in this context.  Vakilian, 335 F.3d at 517.  A plaintiff does not show "deliberate falsehood by simply contradicting a warrant affidavit."  Butler, 936 F.3d at 419.  Wroblewski has provided no evidence that at the time Rinehart swore to the complaint/warrant, that he knew that what he was swearing to was false.  Id.  At most, she presented evidence that Rinehart acted negligently by failing to read the entirety of the investigative file and relying on, what he thought, was a fellow officer's assessment that the investigation was complete.  Because Wroblewski has not shouldered the burden of making a substantial showing that Rinehart stated a deliberate falsehood or showed reckless disregard for the truth, Rinehart is entitled to qualified immunity from suit for the § 1983 claims against him in this case, Counts I, II, III, and IV.

### 2. State-Law Claims

The claims that remain against Doherty and Rinehart are state-law claims for civil conspiracy, gross negligence, and abuse of process.  See Compl.  Doherty, Rinehart, and Wroblewski group their arguments related to civil conspiracy and gross negligence together, so the Court will examine those claims together before proceeding to analyzing Wroblewski's abuse of process claim.

### a. Civil Conspiracy (Count VI) and Gross Negligence (Count VII)

Doherty and Rinehart's arguments that they are entitled to summary judgment on Wroblewski's civil conspiracy and gross negligence claims against them are: (i) that gross

negligence is not an independent cause of action, Wayne Mot. at PageID.1489; (ii) to prove a civil conspiracy claim, Wroblewski must prove a separate actionable tort and she has not done so, Wayne Mot. at PageID.1489–1490; and (iii) therefore, because Wroblewski's civil conspiracy claim fails, her gross negligence claim fails as well. <u>Id.</u>

As to her claim for civil conspiracy, Wroblewski asserts that "all four individually-named [d]efendants were involved in a conspiracy to falsely arrest [p]laintiff for actions that were not criminal at all." Resp. to Wayne Mot. at PageID.2737.

The Court agrees with Wroblewski. As stated above, she has properly supported a civil conspiracy claim that Defendants agreed to falsely arrest her. Therefore, summary judgment as to Doherty and Rinehart state civil conspiracy claim is denied (Count VI).

Doherty and Rinehart's only argument related to gross negligence is that it is not an independent cause of action and because Wroblewski's civil conspiracy claim fails, her gross negligence claim must fail as well. Wayne Mot. at PageID.1489–1490. But the Court already found that she has a viable civil conspiracy claim. Because Doherty and Rinehart do not make any other arguments for summary judgment on the gross negligence claim, their motion for summary judgment on this claim is denied.

Therefore, the Court denies summary judgment to Doherty and Rinehart on Counts VI and VII.

### b. Abuse of Process (Count VIII)

Doherty and Rinehart argue that Wroblewski failed to bring an abuse of process claim against them because her allegations focus on their alleged activities when bringing the charges, not for abusing process after is the charges were issued. Wayne Mot. at PageID.1490.

Wroblewski argues that her claim survives because Doherty and Rinehart "brought charges against [her]" thereby "misu[ing] the criminal process to prosecute [her]" for what is "obviously a

civil matter." Resp. to Wayne Mot. at PageID.2740. She alleges that Doherty and Rinehart "knew that their misrepresentations" in the investigator's report would "cause a warrant to be issued" so that she would be "wrongly incarcerated." Id.

As stated above, Wroblewski's abuse of process claim fails because her allegations involve the initiation of criminal proceedings, not the misuse of process. Garcia, 520 F. App'x at 311. Therefore she does not have a viable abuse of process claim as to Doherty and Rinehart so the Court grants summary judgment to them for Count VIII.

In sum, the Court denies summary judgment as to Doherty and Rinehart for Counts VI and VII and grants them summary judgment as to Count VIII.

### C. Wroblewski's Claim Against the City of Detroit and Wayne County (Count V)

Wroblewski seeks to hold the City of Detroit and Wayne County liable under § 1983 for "permit[ing] customs, practices, and/or policies which resulted in the deprivation of her constitutional rights." See Count V of Compl. She explains that these customs, practices, and policies include, but are not limited to, failing to train and properly supervise DiGuiseppe and Giaquinto, Doherty, and Rinehart on various matters. Id.

In Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978), the Supreme Court held that municipalities can be subject to § 1983 liability for constitutional violations. To hold an entity liable under a Monell theory of liability, a plaintiff must show that the entity, "through its deliberate conduct, ... was the 'moving force' behind the injury alleged." Jackson v. City of Cleveland, 925 F.3d 793, 828 (6th Cir. 2019) (punctuation modified). A local government cannot be held liable under § 1983 "for an injury inflicted solely by its employees or agents." Monell, 436 U.S. at 694. Rather, to prove liability, a plaintiff must prove that the local government's official policy or custom caused "one of its employees to violate the plaintiff's constitutional rights." D'Ambrosio v. Marino, 747 F.3d 378, 386 (6th Cir. 2014) (citing Monell, 436 U.S. at 692).

A plaintiff may establish <u>Monell</u> liability by demonstrating one of the following: (i) "the existence of an illegal official policy or legislative enactment;" (ii) "that an official with final decision making authority ratified illegal actions;" (iii) "the existence of a policy of inadequate training or supervision;" or (iv) "the existence of a custom of tolerance or acquiescence of federal rights violations." <u>Jackson</u>, 925 F.3d at 828 (quoting <u>Burgess v. Fischer</u>, 735 F.3d 462, 478 (6th Cir. 2013)). It appears that Wroblewski brings her claim under the third and fourth theory of <u>Monell</u> liability. <u>See</u> Compl. Count V.

The Court will address Wayne County's arguments and then proceed to the City's arguments.

### 1. Wayne County

Wayne County asserts that Wroblewski has not presented a viable <u>Monell</u> claim because (i) she has not identified a policy that caused a violation of her constitutional rights; (ii) even if she did identify a policy, she has not shown that Wayne County was the moving force behind the alleged injury; and (iii) she has presented no evidence to support her claim that Wayne County failed to train and supervise Doherty and Rinehart. Wayne Mot. at PageID.1492–1493. Wayne County also mentions that Wroblewski must be relying on a "single-incident" theory of liability because she has not identified other incidents where similar violations occurred. <u>Id.</u> at PageID.1493.

Wroblewski makes no arguments related to Doherty, so she has waived that argument. <u>See</u> <u>Briggs v. Univ. of Detroit-Mercy</u>, 22 F. Supp. 3d 798, 811 (E.D. Mich. 2014), aff'd, 611 F. App'x 865 (6th Cir. 2015) ("If a party fails to respond to an argument raised in a motion the court can assume that opposition to the motion is waived and the motion may be granted.") (punctuation modified).

As to Rinehart, Wroblewski relies on the single-incident theory established in <u>Ouza</u>, namely, that it is "obviously foreseeable" that sheriff deputies would be required to "conduct investigations, determine probable cause, draft IRs/[w]arrant [p]ackets, apply for arrest warrants and testify." Resp. to Wayne Mot. at PageID.2741. She asserts that Rinehart admitted to a lack of training in these areas when he testified in his deposition that since he has been employed by the Wayne County Sheriff's Department beginning in 2003, he has only received "a course or two by the prosecutor's office" on arrests and probable cause; that he received "no formalized training" on investigations, conflicts of interest, and drafting investigator's reports; and that he received no training on distinguishing between when matters are civil and criminal. <u>Id.</u> at PageID.2741–2742. Thus, she argues, she has a viable claim for failure to train/supervise under <u>Monell</u>. <u>Id.</u> at PageID.2742.

The Court agrees with Wroblewski. As discussed above, to hold a municipality liable under § 1983, a plaintiff "must prove that the municipality's policy or custom caused the alleged injury." <u>Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.</u>, 455 F.3d 690, 700 (6th Cir. 2006). "One way to prove an unlawful policy or custom is to show a policy of inadequate training or supervision." <u>Id.</u> (punctuation modified).

"To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." <u>Ouza</u>, 969 F.3d at 286–287 (punctuation modified). That is, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact." <u>Id.</u> (punctuation modified).

35

"There are at least two situations in which inadequate training could be found to be the result of deliberate indifference." Id. at 287 (punctuation modified).  The most common way is to show that the municipality "failed to act in response to repeated complaints of constitutional violations by its officers." Id. (punctuation modified).  A second way that a plaintiff can show that a municipality was deliberately indifferent is by "fail[ing] to equip law enforcement officers with specific tools to handle recurring situations." Id. (punctuation modified).  "Under this approach… a plaintiff does need to show that the municipality had notice of a pattern of unconstitutional conduct." Id. (punctuation modified).

Wroblewski argues that Wayne County is liable under the latter theory of deliberate indifference.  Resp. to Wayne Mot. at PageID.2740–2741.  She demonstrated, through Rinehart's own testimony, that Wayne County did not provide regular training to its sheriff deputies on probable cause and arrests and that it provided "no formalized" training on investigations, conflicts of interest, and drafting investigator's reports; and no training on distinguishing between when matters are civil and criminal.  Id. at PageID.2741; Rinehart Dep. Tr. at PageID.2989.  Wayne County has not put forth any facts that dispute this.  Instead, in its reply, Wayne County incorrectly argues that Wroblewski cannot "solely rely on 'failure to train/supervise' rather, they must establish that there was an unconstitutional policy or practice, which Plaintiff has simply failed to do."  Reply to Wayne Mot. at PageID.3471 (emphasis in original).  As stated above, that is not the correct standard.

The failure to provide any training, or one or two trainings, over the course of twenty years, on essential functions of a law enforcement officer's duties is constitutionally inadequate.  Ouza, 969 F.3d at 289 (holding that "the failure to provide any training on probable cause determinations

or the use of force…is constitutionally inadequate."). Wayne County presents no evidence to dispute this lack of training, therefore it is not entitled to summary judgment on this claim.

### 2. City of Detroit

The City of Detroit makes two arguments as to why summary judgment should be granted in its favor. First, the City argues that Wroblewski has failed to identify a city policy, practice, or procedure that caused the alleged constitutional violations. City Mot. at PageID.1238–1241. Second, it argues that if DiGuiseppe and Giaquinto's motion for summary judgment is granted, then the Monell claim against it must also fail. Id. at PageID.1241–1242. The Court did not grant DiGuiseppe and Giaquinto's motion for summary judgment in full, so the City's second argument fails.

As with her argument regarding Wayne County, Wroblewski argues that her Monell theory of liability here is failure to train. Resp. to City Mot. at PageID.1662–1663. She cites DiGuiseppe and Giaquinto's training records to demonstrate the City of Detroit's deliberate indifference. Id. at PageID.1664–1665. As to DiGuiseppe, she argues that there is no record that he received training during 2014–2017 and from March 11, 2021 to when he left DPD in 2023. Id. at PageID.1665. Specific to training regarding report writing and arrest procedures, the record states that DiGuiseppe was last trained on August 24, 2009 and November 16, 2010, respectively. DiGuiseppe Mgmt. Awareness Sys. Entry at PageID.1906 (Dkt. 67 *SEALED*). As to Giaquinto, she argues that he has not received any training since 10/23/2018 and his last "training in terms of legal updates" was on October 9, 2012. Resp. to City Mot. at PageID.1665. Wroblewski notes that Giaquinto does not have any training related to "arrest procedures" on his record and that his last training on "report writing" was on October 5, 2009. Id.

In its reply, the City of Detroit argues, for the first time, that Wroblewski has failed to show the deliberate indifference element of a failure to train claim so her <u>Monell</u> claim must fail.  Reply to City Mot. at PageID.2044–2049.[25]  The City argues that Wroblewski failed to show a "history of abuse and prior instances of similar alleged unconstitutional conduct" that would put "the City on notice that there was a <u>particular</u> training area deficiency."  <u>Id.</u> at PageID.2046 (emphasis in original).  As to Wroblewski's single-incident theory of liability, the City argues that Wroblewski has "cherry-picked" DiGuiseppe and Giaquinto's training records and "ignores" testimony from other DPD officials, Sergeants Kenneth Butler and Deanna Wilson, who testified to the training that DPD officers receive formally and informally.  <u>Id.</u> at PageID.2047.

Because its reply brief is the first time the City of  Detroit makes these arguments, they are waived.  <u>Sanborn v. Parker</u>, 629 F.3d 554, 579 (6th Cir. 2010) (stating that the Sixth Circuit has "consistently held" that arguments made for the first time in a reply brief are waived).  The City of Detroit's arguments should have been raised in its motion for summary judgment.

Therefore, the Court denies summary judgment as to the City of Detroit and Wayne County as to Count V.

### III.     CONCLUSION

---

[25] The City of Detroit argues in n. 1 that Wroblewski did not assert her failure to train argument in her responses to the City's interrogatories.  Reply to City Mot. at PageID.2044.  The Court agrees that Wroblewski did not make failure to train arguments in her interrogatory responses.  After this realization, however, the City of Detroit did not file a motion to re-open discovery to require Wroblewski to provide additional interrogatory responses.  Instead, the City of Detroit did nothing but file its reply.  Furthermore, the City of Detroit cannot plead ignorance to Wroblewski's failure to train/supervise claims.  They are clearly stated in her complaint.  Count V to Compl. at PageID.20–21.  Also, Wayne County made arguments related to failure to train in its motion for summary judgment, Wayne Mot. at PageID.1492–1493, so her argument is clearly not "new" as the City of Detroit alleges.

For the reasons explained above, the Court denies summary judgment as to DiGuiseppe and Giaquinto as to Counts I, II, IV, VI, and VII and grants summary judgment as to Counts III and VIII (Dkt. 63).  The Court denies summary judgment as to Doherty and Rinehart as to Counts VI and VII but grants it as to Counts I, II, III, IV, and VIII (Dkt. 64).  The Court denies summary judgment as to Wayne County (Count V) (Dkt. 64) and denies summary judgment as to the City of Detroit (Count V) (Dkt. 61).

**SO ORDERED.**

Dated: September 29, 2025                     s/Mark A. Goldsmith
Detroit, Michigan                             MARK A. GOLDSMITH
                                              United States District Judge

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 29, 2025.

                                              s/Joseph Heacox
                                              JOSEPH HEACOX
                                              Case Manager